Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/23/2020 10:11 AM CDT

Gage County, Nebraska, appellant, v.
Employers Mutual Casualty
company, appellee.

___ N.W.2d ___

Filed January 31, 2020.    No. S-18-1118.

1. **Summary Judgment: Appeal and Error.** In reviewing a summary judgment, the court views the evidence in the light most favorable to the party against whom the judgment was granted and gives such party the benefit of all reasonable inferences deducible from the evidence.

2. **Declaratory Judgments: Appeal and Error.** In an appeal from a declaratory judgment, an appellate court, regarding questions of law, has an obligation to reach its conclusion independently of the conclusion reached by the court below.

3. **Insurance: Contracts: Appeal and Error.** The interpretation of an insurance policy presents a question of law that an appellate court decides independently of the trial court.

4. **Insurance: Contracts.** A court construes insurance contracts like other contracts, according to the meaning of the terms that the parties have used.

5. ____: ____. In construing an insurance contract, a court must give effect to the instrument as a whole and, if possible, to every part thereof.

6. **Insurance: Contracts: Proof.** In a coverage dispute between an insured and the insurer, the burden of proving prima facie coverage under a policy is upon the insured.

7. ____: ____: ____. If the insured meets the burden of establishing coverage of the claim, the burden shifts to the insurer to prove the applicability of an exclusion under the policy as an affirmative defense.

8. **Insurance: Contracts.** Contracts of insurance, like other contracts, are to be construed according to the sense and meaning of the terms which the parties have used, and if they are clear and unambiguous, their terms are to be taken and understood in plain, ordinary, and popular sense.

9. **Contracts.** When the terms of a contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as the ordinary or reasonable person would understand them.

10. **Insurance: Contracts.** In situations involving the interplay between primary and umbrella coverages, courts should examine the overall pattern of insurance and construe each policy as a whole.

Appeal from the District Court for Lancaster County: Jodi L. Nelson, Judge. Reversed and remanded for further proceedings.

Joel D. Nelson and Joel Bacon, of Keating, O'Gara, Nedved & Peter, P.C., L.L.O., for appellant.

Karen K. Bailey and L. Paige Hall, of Engles, Ketcham, Olson & Keith, P.C., for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Funke, J.

This is a declaratory judgment action brought by Gage County, Nebraska, alleging that its insurer, Employers Mutual Casualty Company (EMC), has defense and indemnity obligations for federal court judgments entered against Gage County in 2016. The district court overruled Gage County's motion for partial summary judgment and entered summary judgment in favor of EMC. We reverse the district court's decision and remand the cause for further proceedings.

## I. BACKGROUND

The following background describes the judgments underlying Gage County's insurance claim, the nature of the insurance dispute between Gage County and EMC, and the district court's decision granting summary judgment in favor of EMC.

### 1. Murder and Prosecution

Helen Wilson was raped and murdered in Beatrice, Nebraska, on February 5, 1985. After months of investigation, the case

became cold. In 1989, Gage County Sheriff Jerry DeWitt and five deputy sheriffs—Burdette Searcey; Wayne Price, who was also a psychologist; Gerald Lamkin; Kent Harlan; and Mark Meints—reopened the investigation. DeWitt, Searcey, and Price were the primary investigators and interviewed multiple witnesses and suspects.

After the additional investigative efforts, the Gage County Attorney Richard Smith charged six people with crimes related to Wilson's death: Joseph White, James Dean, Kathleen Gonzalez, Thomas Winslow, Ada Joann Taylor, and Debra Shelden. They became known as the Beatrice Six. Dean, Gonzalez, Taylor, and Shelden agreed to plead guilty and testify against White and Winslow. In November 1989, a jury convicted White of Wilson's murder, and in December 1989, Winslow entered a no contest plea. Nearly two decades later, the Beatrice Six were exonerated after DNA evidence showed that they were not present at the crime scene. In 2009, the Nebraska Board of Pardons granted pardons to each member of the Beatrice Six.

## 2. Civil Rights Lawsuits

In July 2009, five members of the Beatrice Six filed civil rights lawsuits in the U.S. District Court for the District of Nebraska. The sixth member, Shelden, filed suit in 2011, and the cases were consolidated. The defendants were Gage County, the Gage County sheriff's office, the Gage County Attorney's office, and, in their individual and official capacities, DeWitt, Smith, Searcey, Price, Lamkin, Harlan, and Meints. The complaints alleged that the defendants had manufactured and coerced false or misleading evidence for the purpose of arresting, prosecuting, convicting, and imprisoning the Beatrice Six for Wilson's death. The complaints alleged that the defendants made intentional misrepresentations in arrest warrants, utilized improper interrogation techniques, conducted a reckless investigation, and intentionally prosecuted the plaintiffs without proper evidentiary support. The complaints asserted claims for malicious prosecution, false arrest, conspiracy, and having

policies, practices, and customs that deprived the plaintiffs of their civil rights.

### 3. Insurance Policies

On February 2, 1989, Gage County purchased three insurance policies from EMC: (1) a commercial general liability (CGL) policy, (2) a linebacker policy, and (3) an umbrella policy. The effective period of the three policies was from February 2, 1989, to February 2, 1990.

### (a) CGL Policy

The CGL policy was written on an occurrence basis, with a $1 million limit per occurrence and $2 million aggregate limit. Under the insuring clause, EMC agreed to pay sums that Gage County becomes legally obligated to pay as damages because of "'personal injury' . . . to which this insurance applies." The policy states, "This insurance applies to 'personal injury' only if caused by an offense: (1) [c]ommitted . . . during the policy period; and (2) [a]rising out of the conduct of your business . . . ." The policy defines "personal injury" to mean "injury, other than 'bodily injury,' arising out of one or more of the following offenses: . . . [f]alse arrest, detention or imprisonment [or] [m]alicious prosecution."

An endorsement to the CGL policy excludes coverage for "'personal injury' . . . due to the rendering [of] or failure to render any professional service." The endorsement applies to "any and all professional services" but the term "professional services" is not defined in the CGL policy or endorsement.

### (b) Linebacker Policy

The linebacker policy is a claims-made policy covering losses from errors or omissions in the discharge of organizational duties. The linebacker policy excludes coverage for "[a]ny liability for personal injury" (emphasis omitted). Like that of the CGL policy, the linebacker policy's definition of "personal injury" includes injury arising out of the offenses of false arrest, detention, or imprisonment or malicious prosecution.

The linebacker policy similarly excludes liability arising from the "rendering [of] or failure to render professional services" (emphasis omitted). The policy defines "professional services" as "anyone employed in any of the following professions while performing their duties as such":

    1. The practice of medicine, such as (but not limited to) physician, surgeon, osteopath, chiropractor, anesthesiologist, dentist, psychiatrist, psychologist, nurse, paramedic, EMT, pharmacist, etc.

    2. The practice of law (including the judiciary).

    3. The practice of accounting.

    4. Architects, engineers, surveyors or draftsmen.

Gage County does not contend that the linebacker policy provides coverage for the federal court judgments. In not doing so, Gage County acknowledges that the linebacker policy is a claims-made policy and that no claims were made during the effective period.

### (c) Umbrella Policy

The umbrella policy covers "loss in excess of the primary limit" of the policies "listed in Schedule A . . . because of . . . Personal Injury" (emphasis omitted). Schedule A lists both the CGL policy and the linebacker policy issued by EMC to Gage County. In an endorsement applicable to political subdivisions, coverage under the umbrella policy was expressly conditioned on the availability of coverage under a primary policy described in schedule A. Like the two other policies, the umbrella policy's definition of "personal injury" includes injuries arising out of the offenses of false arrest, detention, or imprisonment or malicious prosecution. Under certain circumstances, the umbrella policy will drop down and provide primary coverage if the primary aggregate limit is totally used up.

The umbrella policy contains an exclusion for liability arising out of "professional liability" or "excluded occupations liability," but the exclusion states that it does not apply to the extent that "professional or excluded occupations liability

coverage" is provided by a CGL policy (emphasis omitted). The umbrella policy defines "professional liability" as "liability arising out of the rendering of a service relating to a profession in a manner which is reasonable and in keeping with the standards of that profession and formal accreditation or failure to render a service." The definition

includes but is not necessarily limited to, professions such as:

A. The practice of medicine, i.e., physician, surgeon, osteopath, chiropractor, anesthesiologist, dentist, psychiatrist, psychologist, nurse, paramedic, EMT, pharmacist, etc.

B. The practice of law

C. The practice of accounting

D. Insurance sales or consulting

E. Real estate sales or management

F. Architects, engineers, surveyors, or draftsmen

G. Stockbrokers

The umbrella policy separately defines "excluded occupations liability" as

liability arising out of the rendering of a service relating to an occupation listed below or the failure to render a service:

A. A Director or Officer of an Organization

B. Data Processing or Computer Software Development

C. Law Enforcement

D. Travel Agents

E. Publishers, Printers, or Broadcasters[.]

### 4. TENDER OF DEFENSE

In July 2009, Gage County tendered defense of the first five Beatrice Six lawsuits to EMC and provided copies of the five complaints which had been filed. In October, EMC denied Gage County's request for a defense and indemnification under all three insurance policies. EMC denied coverage under the linebacker policy, because no claims were brought during the policy period, from 1989 to 1990.

With respect to the CGL policy, EMC noted it covered personal injury arising out of offenses such as false arrest or imprisonment and malicious prosecution. However, EMC stated that the professional services exclusion applied. EMC stated:

> The lawsuits filed by the Plaintiffs against you allege the use of improper investigative techniques, improper training techniques, malicious prosecution, false arrest and conspiracy to violate civil rights. A professional service has been determined to be a service involving specialized skill, training or knowledge. Your investigation leading to the arrests of the Plaintiffs involved special skill, training and knowledge, which constitutes a professional service.

EMC stated that it did not have a duty under the CGL policy to defend or indemnify Gage County in the lawsuits. EMC denied coverage under the umbrella policy due to the professional liability and excluded occupations liability exclusions. That section of the denial letter stated:

> The definition of "professional liability" includes "the practice of law" and psychiatry or psychology and the definition of "excluded occupations liability" includes "law enforcement". Consequently, . . . the [u]mbrella [policy] does not provide coverage for liability arising out of law enforcement or the practice of law, psychology or psychiatry.

### 5. Jury Finds in Favor of Beatrice Six

The claims that went to the federal district court jury were whether DeWitt, Searcey, and Price manufactured evidence or conducted a reckless investigation which resulted in the convictions or pleas of the Beatrice Six. The jury also considered whether DeWitt, Searcey, and Price engaged in a conspiracy to violate constitutional rights and whether Gage County through DeWitt had a policy or custom of violating civil rights.

The jury concluded that Searcey and Price had manufactured evidence or engaged in a reckless investigation with respect to each of the plaintiffs. The jury found that DeWitt had not violated the plaintiffs' rights and that the defendants had not engaged in a conspiracy. The jury found Gage County liable through DeWitt's policy or custom of allowing violations of civil rights. In total, the jury entered judgments in favor of the plaintiffs and against Gage County for more than $28 million in damages. The jury's decision was upheld on appeal.

### 6. Present Insurance Lawsuit

In January 2017, Gage County filed its complaint for declaratory judgment against EMC alleging that under the CGL policy, EMC had a duty to defend Gage County in the Beatrice Six litigation and a duty to indemnify Gage County up to the $2 million aggregate policy limit. The complaint also alleged there "may be" additional limits available under the linebacker or umbrella policy. EMC filed an answer in which it alleged, among other affirmative defenses, that Gage County's claims were not covered under the CGL policy due to the professional services exclusion. EMC also alleged that neither the linebacker policy nor the umbrella policy afforded coverage for Gage County's claims.

In April 2018, EMC moved for summary judgment on all Gage County's coverage claims, and in May, Gage County moved for partial summary judgment on the question whether, "[f]or purposes of [Gage County's] coverages with [EMC], law enforcement was an occupation and not a profession."

On November 1, 2018, the district court granted EMC's summary judgment motion and denied Gage County's partial summary judgment motion. The court ruled that the CGL policy's professional services exclusion barred coverage under the CGL policy for all claims brought against the Gage County defendants in the Beatrice Six litigation. The court also held that there was no coverage under either the linebacker policy or the umbrella policy.

The court found that pursuant to *Marx v. Hartford Acc. & Ind. Co.*,[1] the professional services exclusion applied, because the allegations about the investigation concerned law enforcement's decisionmaking process based on training and experience. The court found that the professional services exclusion applied to the claims based on the acts of the county attorney and the acts of Price as a psychologist, in addition to those acts Price provided as a sheriff's deputy.

Gage County appealed, and we granted its petition to bypass the Nebraska Court of Appeals.

## II. ASSIGNMENTS OF ERROR

Gage County assigns, restated, that the district court erred (1) in concluding the professional services exclusion in the CGL policy barred coverage; (2) in failing to conclude that when the policies are considered in context, the parties intended for law enforcement to be an occupation and not a professional service; (3) in relying upon the definition of "professional service" from *Marx*[2]; (4) alternatively, in failing to conclude that the term "professional services" in the CGL policy is ambiguous; (5) in concluding that there was no excess coverage under the umbrella policy; and (6) in concluding that Price was engaged in providing professional services as a psychologist.

## III. STANDARD OF REVIEW

[1,2] In reviewing a summary judgment, the court views the evidence in the light most favorable to the party against whom the judgment was granted and gives such party the benefit of all reasonable inferences deducible from the evidence.[3] In an appeal from a declaratory judgment, an appellate court, regarding questions of law, has an obligation to reach its conclusion independently of the conclusion reached by the court below.[4]

---

[1] *Marx v. Hartford Acc. & Ind. Co.*, 183 Neb. 12, 157 N.W.2d 870 (1968).

[2] *Id.*

[3] *Chase County v. City of Imperial*, 302 Neb. 395, 923 N.W.2d 428 (2019).

[4] *Id.*

[3] The interpretation of an insurance policy presents a question of law that an appellate court decides independently of the trial court.[5]

## IV. ANALYSIS

[4,5] The issue presented is whether the district court correctly applied the professional services exclusion in the context of the insurance policies and claims at issue here. We construe insurance contracts like other contracts, according to the meaning of the terms that the parties have used.[6] In construing an insurance contract, a court must give effect to the instrument as a whole and, if possible, to every part thereof.[7]

[6,7] In a coverage dispute between an insured and the insurer, the burden of proving prima facie coverage under a policy is upon the insured.[8] If the insured meets the burden of establishing coverage of the claim, the burden shifts to the insurer to prove the applicability of an exclusion under the policy as an affirmative defense.[9]

Due to a stipulation entered into between the parties, the sole issue before us on appeal is the applicability of the professional services exclusion. We therefore express no opinion on any other coverage-related issue in the case. As the case comes before the court, in denying Gage County's insurance claim, EMC did not contest that the allegations of malicious prosecution or false arrest, detention, and imprisonment asserted in the Beatrice Six complaints sufficiently alleged a "personal injury" as defined under the CGL policy. The question is therefore whether EMC met its burden to prove that the professional

---

[5] *Drake-Williams Steel v. Continental Cas. Co.*, 294 Neb. 386, 883 N.W.2d 60 (2016).

[6] *Federated Serv. Ins. Co. v. Alliance Constr.*, 282 Neb. 638, 805 N.W.2d 468 (2011).

[7] *Harleysville Ins. Group v. Omaha Gas Appliance Co.*, 278 Neb. 547, 772 N.W.2d 88 (2009).

[8] *Drake-Williams Steel, supra* note 5.

[9] *Id.*

services exclusion applies on these facts. To answer that question, we must determine the meaning of the term "professional services" under the policies at issue.

EMC urges us to apply the definition of "professional services" announced in *Marx* and conclude as a matter of law that the conduct of law enforcement in this case qualifies as a professional service.[10] Gage County urges us to apply the definition of "profession" from our cases construing Neb. Rev. Stat. § 25-222 (Reissue 2016), the statute of limitations governing professional negligence, and conclude as a matter of law that law enforcement is not a profession. We address both arguments below. We find that neither body of case law is controlling and that the unambiguous terms of the insurance policies are controlling.

### 1. Case Law Definitions
### Not Controlling

The district court found that the seminal meaning of "professional services," when undefined in an insurance policy, comes from our decision in *Marx*. In *Marx*, in considering the meaning of the term "professional services" as it appeared in a professional liability insurance coverage provision, we defined a professional act or service to mean "one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual."[11] We said that to "determin[e] whether a particular act is of a professional nature or a 'professional service' we must look not to the title or character of the party performing the act, but to the act itself."[12] *Marx* held that the boiling of water for sterilization purposes was not a professional service, because it was a routine equipment cleaning act that any unskilled person

---

[10] See *Marx, supra* note 1.

[11] *Id.* at 14, 157 N.W.2d at 872.

[12] *Id.*

could perform. The *Marx* definition of "professional services" has been "'widely accepted'"[13] by both state and federal courts and is the "most commonly employed"[14] definition.

Before the district court, Gage County argued that *Marx* does not control this case, because *Marx* concerned a claim under a professional liability policy and because subsequent Nebraska jurisprudence concerning the statute of limitations applicable to actions for professional negligence further developed the meaning of "professional services."[15] The district court disagreed with Gage County, stating that a more recent case, *R.W. v. Schrein*,[16] relied upon *Marx* to define the term "professional services" as used in an insurance policy. The court stated that although Nebraska's appellate courts have not yet decided the issue, courts in other jurisdictions have applied *Marx* and held that law enforcement services qualify as professional services.[17]

On appeal, Gage County argues that *Marx* and *Schrein*, which also concerned a professional liability policy, do not control the meaning of "professional services" in the context of a professional services exclusion in a CGL policy. In support

---

[13] *Medical Records Assoc. v. American Empire Surplus*, 142 F.3d 512, 514 (1st Cir. 1998), quoting *Roe v. Federal Ins. Co.*, 412 Mass. 43, 587 N.E.2d 214 (1992). See *Harad v. Aetna Cas. and Sur. Co.*, 839 F.2d 979 (3d Cir. 1988).

[14] *Bank of California, N. A. v. Opie*, 663 F.2d 977, 981 (9th Cir. 1981). See *Nautilus Ins. Co. v. Strongwell Corp.*, 968 F. Supp. 2d 807 (W.D. Va. 2013).

[15] See, *Wehrer v. Dynamic Life Therapy & Wellness*, 302 Neb. 1025, 926 N.W.2d 107 (2019); *Churchill v. Columbus Comm. Hosp.*, 285 Neb. 759, 830 N.W.2d 53 (2013); *Tylle v. Zoucha*, 226 Neb. 476, 412 N.W.2d 438 (1987).

[16] *R.W. v. Schrein*, 264 Neb. 818, 652 N.W.2d 574 (2002).

[17] See, *Western World Ins. v. American and Foreign Ins.*, 180 F. Supp. 2d 224 (D. Me. 2002); *Lansing Community College v. National Union Fire*, No. 1:09-CV-111, 2010 WL 774877 (W.D. Mich. Mar. 1, 2010) (unpublished opinion). See, also, *Yatsko v. Graziolli*, No. 1:18 CV 1675, 2019 WL 2497794 (N.D. Ohio June 17, 2019).

of this view, Gage County relies upon our jurisprudence in the area of professional negligence in which we have held that in determining whether the statute of limitations for a professional negligence claim applies, the court must determine whether the defendant is a professional and then must determine whether the defendant was acting in a professional capacity in rendering the services upon which the claim is based.[18] Gage County contends that we analyze the same two questions in the insurance context to determine whether a particular act qualifies as a professional service.

According to Gage County, the first inquiry is whether an individual's occupation rises to the level of a profession. The definition of "profession" for the purpose of determining the professional negligence statute of limitations under § 25-222 is (1) a calling requiring specialized knowledge and often long and intensive preparation, including instruction in skills and methods, as well as in the scientific, historical, or scholarly principles underlying such skills and methods; (2) maintaining by force of organization or concerted opinion high standards of achievement and conduct; and (3) committing its members to continued study and to a kind of work which has for its prime purpose the rendering of a public service.[19] The second inquiry under Gage County's argument is whether a particular act falls within the scope of a profession and arose out of the specialized skill, knowledge, or training associated with the profession. Gage County argues that based on the first inquiry alone, we should reverse the district court's decision. Gage County further contends that *Marx* and *Schrein* did not address the first inquiry, because the insured in an insurance dispute involving a professional liability policy necessarily will be a professional. Gage County argues that *Marx* and *Schrein* address only the second inquiry of whether a particular act falls within the scope of a profession.

---

[18] See *Churchill, supra* note 15.

[19] *Wehrer, supra* note 15.

In response, EMC contends that courts have applied *Marx* to define a professional services exclusion in a CGL policy.[20] For example, the district court relied upon *Western World Ins. v. American and Foreign Ins.*,[21] a decision issued by a U.S. magistrate judge which addressed a claim under a CGL policy based on a death from an officer-involved shooting. The magistrate judge relied upon the definition of "professional services" from *Marx* and found that the professional services exclusion applied, because the officer's decision to use deadly force was based on the officer's specialized training and experience.

The district court also relied upon a federal district court decision which involved facts similar to those of this case.[22] At issue in *Lansing Community College v. National Union Fire*[23] was a college's defense and indemnity request based on a claim that college law enforcement officers had manufactured evidence in a murder investigation. The court relied upon *Marx* and found that the activities of police officers fell within a professional services exclusion in a CGL policy, because police officers receive specialized training and education and often are called upon to make decisions using this training. The court found that police activities such as interviewing suspects and witnesses, investigating crimes, and assisting in the prosecution of criminal cases are the types of activities that may be considered professional services.[24]

While we agree with EMC and the district court that *Marx* has been followed by courts across the country, we need not decide, in this case, whether it is more appropriate to apply

---

[20] See, *American Economy Ins. Co. v. Jackson*, 476 F.3d 620 (8th Cir. 2007); *Harad, supra* note 13; *Boggs v. Camden-Clark Memorial Hosp. Corp.*, 225 W. Va. 300, 693 S.E.2d 53 (2010); *Hollingsworth v. Commercial Union Ins.*, 208 Cal. App. 3d 800, 256 Cal. Rptr. 357 (1989).

[21] *Western World Ins., supra* note 17.

[22] *Lansing Community College, supra* note 17.

[23] *Id.*

[24] *Id.*

the definition from *Marx* or the definition from our cases defining "profession" for purposes of § 25-222. This case does not require us to import definitions from our case law to answer the question of whether law enforcement is considered a profession, because the plain language of the EMC policies answers that question for the parties to this dispute.

## 2. CONTRACT IS CLEAR
### AND UNAMBIGUOUS

[8,9] Contracts of insurance, like other contracts, are to be construed according to the sense and meaning of the terms which the parties have used, and if they are clear and unambiguous, their terms are to be taken and understood in their plain, ordinary, and popular sense.[25] When the terms of the contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as the ordinary or reasonable person would understand them.[26]

[10] We have generally recognized that in situations involving the interplay between primary and umbrella coverages, courts should examine the overall pattern of insurance and construe each policy as a whole.[27] All three EMC policies have exclusions for either "professional services" or "professional liability," and two of the three policies contain definitions of these terms. When determining the meaning of "professional services," we cannot overlook the plain language of the EMC policies.

When the CGL policy, linebacker policy, and umbrella policy are analyzed as a whole, we are persuaded that an ordinary and reasonable person would understand the professional services exclusion to be inapplicable to the acts of law enforcement.

---

[25] See *Safeco Ins. Co. of America v. Husker Aviation, Inc.*, 211 Neb. 21, 317 N.W.2d 745 (1982).

[26] *American Fam. Mut. Ins. Co. v. Hadley*, 264 Neb. 435, 648 N.W.2d 769 (2002).

[27] *Harleysville Ins. Group, supra* note 7.

The CGL policy, linebacker policy, and umbrella policy provide an interrelated pattern of insurance. According to the deposition testimony of the EMC claims manager, at the time these three policies were issued, it was common for insureds like Gage County to purchase all three lines of coverage. In fact, the claims manager testified that in the early 1990's, approximately 100 to 200 municipalities were insured with EMC and most of those municipalities had a CGL policy, a linebacker policy, and an umbrella policy.

The umbrella policy is related to both the CGL policy and the linebacker policy and, under certain conditions, provides excess coverage for both policies. To the extent the umbrella policy provided excess coverage for the linebacker policy, it did so on a claims-made basis. Both the CGL policy and the umbrella policy cover claims for damages arising out of false arrest, detention, or imprisonment or malicious prosecution. In certain circumstances, the umbrella policy provides primary coverage depending on the availability of coverage under the CGL policy. In addition, the applicability of the umbrella policy's professional or excluded occupations liability exclusion in the umbrella policy depends on whether the CGL policy covers professional or excluded occupations liability.

On appeal, both parties argue in their briefs that the policies here are interrelated and must be considered together.

The CGL policy does not define the term "professional services" as used in the professional services exclusion. However, the linebacker policy expressly defines "professional services" to mean anyone employed in an exclusive list of professions, including the practice of medicine, the practice of law, the practice of accounting, architects, engineers, surveyors, or draftsmen. Similarly, the umbrella policy provides a nonexhaustive list of professions which are included within the "professional liability" exclusion, which applies to "liability arising out of the rendering of a service relating to a profession." The list includes services related to the practice of medicine, the practice of law, the practice of

accounting, insurance sales or consulting, real estate sales or management, architects, engineers, surveyors or draftsmen, and stockbrokers. Law enforcement does not appear within the list of professions, but instead appears as one of five specified categories of occupations under the occupations liability exclusion, along with data processing, travel agents, publishers, printers, and broadcasters.

Based on these policy provisions, we conclude that the professional services exclusion under the EMC policies does not apply to law enforcement. Under both the linebacker policy and the umbrella policy, law enforcement clearly does not qualify as a professional service; it is not listed in the exclusive list of professions in the linebacker policy, and it is listed as an "occupation" rather than a profession in the umbrella policy.

The fact that the umbrella policy lists law enforcement as an occupation rather than a profession is a particularly compelling indication of the parties' understanding. It indicates that the parties understood professions and occupations to have separate meanings and include different types of acts or services. It also indicates that they understood law enforcement not to be a profession. Had the parties understood law enforcement as being a profession, it would have been unnecessary to separately list law enforcement as an excluded occupation. And while the umbrella policy contains an "occupations liability . . . exclusion" (emphasis omitted), there is no similar exclusion in the CGL policy that would lead a reasonable person to understand that the CGL policy excludes coverage for law enforcement services. Additionally, the CGL policy's definition of covered "personal injuries" includes "injury . . . arising out of . . . [f]alse arrest, detention or imprisonment [or] [m]alicious prosecution," which are typically understood as acts performed by law enforcement.

Because the result in this case is dictated by a definition of "professional services" supplied by the parties' contract, we reject the parties' arguments which suggest that we apply definitions from case law. Were we to apply definitions from

our case law rather than the definitions the parties have used, we would be rewriting insurance policies. We have recognized that "'it is imperative that the contract made by the parties shall be respected and that a new contract is not interpolated by construction.'"[28]

Upon de novo review, we find merit to Gage County's assignments of error that the district court erred in (1) concluding that the professional services exclusion barred coverage, (2) determining on summary judgment that no excess coverage is available under the umbrella policy, and (3) concluding that the professional exclusion applies to the acts of Price as a psychologist.

The extent of EMC's liability under the CGL policy remains for the district court to determine in the first instance upon remand. Provisions within the umbrella policy suggest that there may be coverage available under that policy if EMC is found to be responsible under the CGL policy. We therefore determine that the district court erred in finding a lack of coverage under the umbrella policy as a matter of law at this stage.

We determine that the court erred in finding that coverage for the claims asserted against Price may be excluded because he is a psychologist, because we do not find that the claims asserted against Price were based on his work as a psychologist. None of the claims against Price were based on medical malpractice, and we agree with Gage County that in manufacturing evidence and engaging in a reckless investigation, Price rendered acts and services as a sheriff's deputy and not as a psychologist. Even if Price was acting as both a sheriff's deputy and a psychologist, the result would be the same. When the underlying lawsuit alleges injuries resulting from the provision of both professional services and nonprofessional services, a professional services exclusion does not negate the insured's

---

[28] *Safeco Ins. Co. of America, supra* note 25, 211 Neb. at 25-26, 317 N.W.2d at 748.

claim.[29] Our decision does not affect Gage County's concession that the claims based on the acts of the county attorney come within the professional services exclusion.

For the foregoing reasons, we reverse the district court's decision granting EMC's motion for summary judgment and remand the cause with directions to sustain Gage County's motion for partial summary judgment and find that the professional services exclusion in the CGL policy does not preclude coverage for Gage County's insurance claims.

## V. CONCLUSION

Based upon the preceding analysis, we conclude that it was error to enter summary judgment in favor of EMC and to overrule Gage County's motion for partial summary judgment. Accordingly, we reverse the district court's decision and remand the cause for further proceedings consistent with this opinion.

Reversed and remanded for
further proceedings.

---

[29] See *National Cas. Co. v. Western World Ins. Co.*, 669 F.3d 608 (5th Cir. 2012).